# UNITED STATES DISTRICT COURT

**FILED**

for the

Eastern District of California

JUN 2 9 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
          DEPUTY CLERK

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| Information Associated with Facebook user IDs | ) |
| "royal.bowens"; "nana.babycharles.9"; and | ) Case No. 2:17-SW-.569-AC |
| "abdul.hashimi.73" which is stored at premises | ) |
| controlled by Facebook, Inc. | ) |
| | ) |

SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ Northern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1591(a) | Sex trafficking of children |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kristine R. Morse
Special Deputy United States Marshal
FBI Sacramento Child Exploitation Task Force
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/29/17

_____
*Judge's signature*

City and state:  Sacramento, California

Allison Claire, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Kristine R. Morse, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with certain Facebook user IDs that are stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscribers or customers associated with the user IDs.

2.      I am a detective with the Sacramento Police Department, and have been a sworn law enforcement officer since 2003.  I am currently designated as a Special Deputy United States Marshal, and assigned as a task force officer on the FBI Sacramento Child Exploitation Task Force.  As part of my duties, I investigate violations of federal law including, but not limited to, violations of 18 U.S.C. § 1591(a) and the sexual exploitation of children.  During the investigation of these cases, I have executed and participated in the execution of search and arrest warrants, and seized evidence of violations of federal law.  I have participated in several investigations relating to sex trafficking and child pornography.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1591(a)(1), sex trafficking of children, have been committed by Abdul Basier Hashimi. There is also probable cause to search the information described in Attachment A for evidence, fruits and instrumentalities of these crimes, as described in Attachment B.

## PROSTITUTION AND THE USE OF THE INTERNET, COMPUTERS AND CELLULAR PHONES TO FURTHER SEX TRAFFICKING

5.     Through my training and experience, I am aware of the following characteristics of prostitution and how the internet, computers, and cell phones are used to further the activities of illegal prostitution and child sex trafficking:

> a.     Individuals who, through enticement, intimidation, or force, enlist persons to become prostitutes, and who profit from the prostitution of others, are called "pimps." Pimps are sometimes euphemistically referred to as "management." Pimps can be either male or female.

> b.     Pimps and prostitutes have embraced the Internet as a means of advertising services and communicating with customers.

> c.     Certain websites have been created to facilitate communications between prostitutes and their clients. The more notable websites relevant to prostitution in the Eastern District of California include "Myredbook.com" (also called myredbook or redbook), the "Adult Services" section of "Backpage.com" and "Nightshift.co." These websites allow pictures to be posted as part of advertisements. I

2

have viewed prostitution advertisements on each of these websites. In addition, I have viewed prostitution advertisements of females I later confirmed to be minors on these websites.

d.   Both pimps and prostitutes use computers to access the Internet in order to post prostitution-related advertisements online, and they often use photographs in the advertisements. These photographs often show nude or semi-nude females. These females are, at times, under the age of 18.

e.   Advertisements for prostitutes often contain codes for the services provided. For example, the term "w4m" means women for men. The term "in-calls only" generally means that the prostitute will be providing the location for the sexual transaction. The term "donation" is often used to mean the cost for the sexual transaction. The advertisements will also often contain a phone number for prospective dates to contact.

f.   Pimps will often use prostitution websites because of their ability to target multiple customers with little or no cost. In addition, the Internet provides a level of anonymity to a pimp, and also allows him to manage the women or girls who work for him remotely.

g.   I know that computers and Internet-capable cellular phones (also known as smart phones) have become an integral part of the prostitution industry. Pimps and the women or girls who work for them will use computers and smart phones to post and update prostitution-related advertisements. Pimps and prostitutes use personal e-mail accounts accessed through the Internet to post their advertisements on prostitution websites. They will also use

3

cellular and smart phones equipped with cameras to take photographs which are then used in the advertisements; these photographs are sometimes sent between pimps and prostitutes prior to, or after, they are used in advertisements. These computers and smart phones may also be used to send and receive emails, text or instant messages, or phone calls from prospective customers (sometimes referred to as "johns," "dates," or "tricks"). Computers, smart phones, cellular phones, and other digital devices will also be used by pimps and prostitutes to communicate with each other (either through voice calls, texts, or other applications), and to communicate with others who may not be pimps or prostitutes, but who may have some connection with the prostitution sub-culture.

h.     Cellular phones store text messages, phone logs, Internet browsing data, photographs and videos that can show evidence of sex trafficking, including sexually explicit images of child sex trafficking victims, and such data can be stored for long periods of time.

i.     Most juvenile prostitutes have pimps. In some cases, prostitutes may have had several pimps during their time working. Prostitutes will often refuse to divulge the identity of their pimps to law enforcement, or may divulge the name of a former pimp in an attempt to placate or distract law enforcement, while protecting the identity of their current pimp. Most pimps instruct the prostitutes on what to say and what not to say to law enforcement.

j.     Prostitutes are instructed by pimps regarding ways to detect

4

undercover officers. When arranging "dates" with clients over the phone, prostitutes rarely discuss the details pertaining to the sexual acts that are to occur, deferring such conversation until they meet the prospective client in person.

k.    Pimps at times use physical force and/or fear to control their prostitutes. They control the prostitutes' actions, and collect monies earned through prostitution. Pimps facilitate prostitution by transporting the prostitutes to locations where prostitution occurs, such as hotels and motels. The pimps, at times, transport prostitutes across state lines for the purpose of prostitution. Pimps and prostitutes often travel together; however, this is not always the case. When a pimp's control over a prostitute is sufficient, he may allow her to work without his direct supervision, or under the supervision of another trusted prostitute. This type of independent activity may occur in the same city as the pimp, or may be in another city or state. In these instances, control by the pimp is maintained through frequent communications with the prostitute, as well as his trusted relationship with the female, the female's fear of what might happen to her or others still under the pimp's direct control if she refuses to comply with the pimp's demands, the female's fear of associates of the pimp in the location in which she is working, and her inability to live independently. When prostitutes are working for a pimp located in a different city or state, money is often sent back to the pimp electronically, either through electronic fund transfers or wire transfers. In some cases, money is carried by the prostitute back to the pimp.

5

l.      As noted, a pimp will oftentimes entrust a newer or younger

prostitute to the custody of a more trusted, "senior" prostitute who

works for him. Such trusted prostitutes are sometimes referred to

as "bottoms" or "bottom bitches." In many instances, the bottoms

communicate with the prostitutes under her control in the same

manner the pimp does, for example, through the use of cellular

telephones.

m.      Prostitutes and/or pimps may stay in motels and hotels while

working. This includes prostitutes who are working locally, as well

as those who travel to other cities. Often, these motels and hotels

are located near major freeways or interstate highways, allowing

easy access to potential customers. Due to their portability and the

frequent availability of internet Wi-Fi at many locations, laptop

computers are often used when pimps and prostitutes travel, to add

and update online postings of prostitution-related advertisements.

Such postings and updates can also be made using smart phones.

Prostitutes and pimps travel via rental vehicles, privately-owned

vehicles, airplanes, or buses. Pimps utilize the monies earned

during acts of prostitution to travel and purchase food, lodging,

clothing and other items.

n.      Pimps often possess firearms to assist in protecting and controlling

their prostitutes.

o.      Pimps may sell drugs as another means to make money. Pimps

often provide drugs to the prostitutes to suppress their appetites

and to assist with the demands of prostituting for long periods of

time.

6

p. Whether male or female, the term "daddy" is commonly used by prostitutes when referring to their pimps. The pimp's phone number is often programmed as "daddy" or some other similar moniker in the prostitute's cell phone.

q. Pimps often request or force their prostitutes to obtain tattoos of names and/or symbols that are related to the pimp's name or nickname. This is known as "branding."

## PROBABLE CAUSE

6. On November 11, 2014, at approximately 9:25 a.m., Sacramento Police Department (SPD) Officer Lamar was working routine patrol in the vicinity of Mack Road and Stockton Boulevard in Sacramento, California. This area is known to law enforcement as a place with prostitution activity.

7. Officer Lamar observed two females, who were later identified as a 14-year-old, D.W. (the "Victim"), and the Victim's older sister ("Individual A"). Officer Lamar observed the Victim and Individual A engaged in a physical altercation. There was an older male also present; this male was later identified as the Victim's foster brother ("Individual B").

8. After identifying the Victim, Officer Lamar found several unopened condoms in her possession. Officer Lamar learned through a search of the SPD computer database that the Victim was reported missing on October 1, 2014. Officer Lamar contacted the Victim's adoptive mother ("P.W."). P.W. told Officer Lamar that she believed that the Victim was working as a prostitute.

7

## The Victim's First Interview

9.      Officer Lamar interviewed the Victim. A summary of the Victim's statements during the interview is set forth below:

        a.     The Victim began working as a prostitute approximately one month before her contact with Officer Lamar. She did not work as a prostitute often, only when she needed money. The Victim estimated that she had worked as a prostitute five times.

        b.     A woman using the name "Star" introduced the Victim to prostitution. The Victim did not know Star's real name. The Victim described Star as a black female who was approximately 18 to 21 years old. Star taught the Victim how to prostitute and told the Victim to ask her (Star) if she (the Victim) ever needed money.

        c.     The Victim used the name "Paris" when she was working as a prostitute. She worked outside of Sacramento because people knew her in Sacramento. Star drove the Victim and other girls to Reno, Los Angeles, Hollywood, and other places. The Victim told Star and the other girls that she was 18.

        d.     The Victim did not post any prostitution advertisements on prostitution-related websites. She only worked on the streets. Star often drove past the Victim to keep an eye on her. Star would pick up the Victim when she was done working as a prostitute. The Victim and Star often slept in Star's car. Sometimes, the Victim and Star would sleep in a hotel room.

        e.     The Victim gave Star half of the money the Victim made working as a prostitute. The Victim stated that she gave Star money in

8

exchange for Star providing transportation.

f.     Star gave an unidentified man money as compensation for taking care of her (Star). Star and the Victim would meet the man to give him money that was made from prostitution. The Victim was never allowed to meet him or get close to him. She described him as a black male with short hair.

g.     Earlier on the morning of November 11, 2014, Star dropped off the Victim on Mack Road near Highway 99 in Sacramento, California, so the Victim could engage in prostitution. The Victim had condoms in case she needed to use them with prostitution clients. The Victim was working as a prostitute when her brother and sister found her.

h.     The Victim stated that no one forced her to be a prostitute and no one hit her. She indicated that she was not supposed to talk to the police because Star and the unidentified man to whom Star gave money told her (the Victim) not to. She was not told what would happen if she talked to the police, but they said "karma" would get her back.

i.     The Victim said her cell phone number was 519-8061 or a similar number.

10.     Officer Lamar asked the Victim for her cellular phone. The Victim provided her phone, which was missing the battery. The Victim retrieved the battery from her bra and handed it to Officer Lamar.

11.     P.W. arrived at the scene and spoke to SPD Officer Rinehart. P.W. told Officer Rinehart that the Victim's cell phone number was (916) 519-8063.

9

12.     SPD officers contacted SPD Detective Derek Stigerts. Detective Stigerts asked the officers to transport the Victim to the SPD Hall of Justice along with any evidence to continue the investigation.

13.     When Detective Stigerts arrived at the Hall of Justice, he received the evidence seized from the Victim. Officers also provide the Victim's cell phone number. Detective Stigerts entered the cell phone number, (916) 519-8063, into the Google.com search engine and located at Backpage.com escort advertisement. The Backpage.com advertisement was linked to the Sacramento region and contained the phone number (916) 519-8063. The advertisement was dated October 3, 2014. As stated above in paragraph 5(c), Backpage.com advertisements, which are purportedly for escort services, are often prostitution advertisements. The post ID was "7670931 Sacramento."

### The Victim's Second Interview

14.     Detective Stigerts interviewed the Victim. Her statement was consistent with what she told Officer Lamar. Set forth below is a summary of the additional details that the Victim provided during the interview:

**[the remainder of this page is blank]**

10

a.  The Victim stated she did not use Internet advertisements for her
    prostitution services, although the Victim also indicated that Star
    made Internet posts for her. She stated that Star also worked as a
    prostitute.

b.  The Victim stated that Star was not her pimp and that Star gave the
    money earned through prostitution to Star's boyfriend. The Victim
    had seen Star's boyfriend beat Star. Star's boyfriend's phone
    number was 230-4048. The Victim indicated that this phone
    number would be in her cell phone.

c.  The Victim stated that she was hit by a car and had to go to the
    hospital for the injuries.

d.  The Victim stated that Star and the Victim had sexual relations.

e.  The Victim did not consent to a search of her cell phone nor would
    she provide the pass code to access her phone.

15.     Following the interview, Detective Stigerts was not able to identify Star or Star's
boyfriend. All evidence was booked into SPD property. The case was classified as inactive.

## The Victim's Third Interview

16.     On July 8, 2015, Detective Stigerts and I contacted the Victim at her home. After
explaining to the Victim that we were there for a follow-up interview, the Victim agreed to be
interviewed. Below is a summary of the Victim's statements:

a.  The Victim stated that everything she said during her first
    interview was a lie. There was no one named Star. She was scared
    during the first interview, but she was not scared anymore.

11

b.    The Victim identified Abdul Basier Hashimi.  She indicated that
      she no longer talks to Hashimi, but that he had previously
      threatened her using the social media application Kik.com.

c.    The Victim stated that she lied about getting hit by a car.  She
      indicated that she was injured when she was in Oakland,
      California.  She was in a car with other girls who wanted her to
      work as prostitutes, so she jumped out of the car.  The Victim
      indicated that Hashimi took her to and from Oakland.

d.    The Victim stated that the Backpage.com advertisement, which
      contained the telephone number (916) 519-8063, was a prostitution
      advertisement for her.  The Victim denied engaging in prostitution.
      She stated that other girls engaged in prostitution.

e.    The Victim stated that Hashimi's telephone number was 670-9792.
      The Victim stated that she initially told Hashimi that she was 17
      years old.  Later, she told him that she was 16 years old.  The
      Victim stated that she never told Hashimi that she was actually 14
      years old.

f.    The Victim stated that she met Hashimi on Tagged, which is a
      social media application.  She indicated that she thought she still
      had their messages saved on her account.

g.    The Victim stated that she ran away from home several times to
      meet with Hashimi.  The Victim indicated that she and Hashimi
      were dating and that they had sex.  The Victim stated that she was
      with Hashimi the entire time she was on the run, from October
      2014 until police found her in November 2014.

h.    The Victim first met Hashimi in person in Natomas, California.

12

Hashimi drove a small 4-door Honda. Hashimi told the Victim that he wanted her to work as a prostitute. The Victim told Hashimi that she did not want to do it, but she would be willing to help him. Hashimi asked the Victim for permission to use her photo in advertisements for other girls who worked as prostitutes for him.

i.    After being contacted by the police, the Victim did not talk to Hashimi often. However, he asked her for money at one point and also threatened her.

j.    Between October 2014 and November 2014, the Victim traveled to Reno, Nevada with a transgender female whose real name was Vincent. This person also used the name Vanessa Jackson. Both went to Reno to work as prostitutes. However, during the trip, the Victim did not work as a prostitute.

k.    Between October 2014 and November 2014, the Victim worked as a prostitute. She did not have sexual intercourse with clients, but would instead perform oral sex or engage in sexual fetishes. The Victim gave all of the money she earned from prostitution to Hashimi, which she estimated to be "thousands of dollars."

l.    There were other girls who worked for Hashimi. There were times when the Victim would watch other girls work for Hashimi as prostitutes on the streets. There were instances when these other girls would give the money they earned from prostitution to the Victim, who would then give the money to Hashimi.

m.    Hashimi hit the Victim on two occasions. During one incident, Hashimi slapped the Victim across the face because she refused to

13

      have sex with a client.  She could not remember the circumstances of the second incident.

n.     The Victim believed Hashimi would come after her if he found out that she gave information to law enforcement.  The Victim has seen Hashimi with a gun.

o.     During the interview, the Victim was shown a photo of Hashimi. The Victim positively identified the person in the photograph as Hashimi.

p.     Detective Morse located a photograph of Vincent Bichard.  The Victim positively identified the person in the photograph as Vanessa Jackson, the transgender female.

q.     On the day the police located the Victim, Hashimi had dropped the Victim off at the Meadowview Light Rail Station in Sacramento, California.  The Victim indicated that she was walking to a hotel to meet a friend to pick up clothes when her family members and the police found her.

17.    During the interview, the Victim provided verbal consent to search her cell phone, which was seized from her on November 11, 2014, and booked into SPD property.

18.    The Victim accessed her Tagged.com account and navigated to an instant message communication between the Victim and a Tagged user with the profile name "Benny L." Benny L's profile indicated that he was 23 years old and lived in Elk Grove, California. There was a photograph of Hashimi's face that was linked to the Benny L profile.  The Victim identified the Benny L profile as Hashimi's Tagged profile.

14

<u>Text Messages Between the Victim and Hashimi</u>

19.     After the Victim provided consent to access her cell phone, I reviewed the contents of the phone.  The phone contains many text messages between the Victim and a person using the phone number (916) 670-9792, which the Victim identified as Hashimi's phone number.  The messages between the Victim and Hashimi began on October 19, 2014, and continued until November 11, 2014, which was the day SPD officers found the Victim.

20.     Metro PCS records indicate that as of November 11, 2014, the account holder for telephone number (916) 670-9792 was Abdul Hashimi.  The address listed in the Metro PCS account records was 8484 McGray Way Sacramento, California 95824.  Sacramento County Sherriff's Department booking records indicate that on February 26, 2014, Hashimi provided his address as 8484 McGray Way Elk, Grove, CA 95624.

21.     The following is an excerpt of text messages between the Victim and Hashimi's telephone number, which were found on the Victim's phone.  The following texts are dated November 11, 2014.[1]

> S: I don't c u outhere
>
> V: Im walking
>
> S: Where
>
> V: Dollar tree
>
> S: oh okay I still don't c u tho
>
> V: Okay
>
> S: wer r u

---

[1] The Victim is identified as "V."  Hashimi is identified as "S."

V: I got a 50 date [act of prostitution for $50]

S: Ok

V: I'm going to his house

S: for how much

V: 50

S: ok ima drive off and dat bill

V: K

S: Imean pay it

V: Just got here

S: ok im parked in front of the laundrymat

V: Coming

S: hey

V: ya

S: wtf [where the fuck] u at

V: Im coming right now

S: u better have more den 50

V: He said he doesn't have any more

S: bitch wen u come back im leaving u just gave a niga a whole hour for

50 dollars wtf

S: just keep bustin some dates [acts of prostitution]

V: U said u were leaving me

22.     Based on my training and experience, the foregoing text messages are consistent with a conversation between a pimp and a prostitute regarding prostitution.

16

### Backpage.com Advertisement for the Victim

23.     Backpage.com provided records regarding escort advertisement post ID 7670931
Sacramento.  As set forth in paragraph 13, this post includes the Victim's telephone number.
Backpage.com records indicate that the email account associated with the Backpage.com account
that posted the advertisement was abdulbasierhashimi@yahoo.com.

### Interview of Abdul Basier Hashimi

24.     On March 15, 2016, Detective Stigerts contacted Hashimi after Hashimi was
arrested, pursuant to a probation warrant.  Hashimi was advised of his *Miranda* rights.  Hashimi
indicated that he understood his rights.  The following is a summary of Hashimi's statements:

   a.    Hashimi denied knowing the Victim.

   b.    Hashimi stated that he has a Tagged.com account.  When asked
         whether his Tagged.com user name was "Benny L," Hashimi
         stated "I guess, I don't know.  I don't really see it like that."

   c.    Hashimi indicated that his email account was his name with the
         internet domain "@yahoo."  When asked if the email address was
         "Abdul Hashimi," he stated it was "Abdul Basier Hashimi."  When
         asked if he still used the email account, Hashimi stated, "Nah, I put
         it on things.  I don't even know the password."

   d.    Hashimi indicated that he believes that Backpage.com is for
         "whores."  He denied using the site.  After being shown that the
         email address abdulbasierhashimi@yahoo.com was linked to a
         Backpage.com advertisement, Hashimi stated "I don't know.  I
         haven't been on my page I mean I haven't been on my email."

17

The Victim's Fourth Interview

25.     On April 6, 2016, Detective Stigerts and I re-interview the Victim.  The following

is a summary of the Victim's statements during the interview:

a.      The Victim did not want Hashimi to be arrested because he knew
        where she lived.   She believed that if Hashimi knew that she spoke
        to law enforcement, it would not be good.

b.      The Victim talked to Hashimi a few weeks prior about the
        situation.  The Victim indicated that she told Hashimi that she
        spoke to the police.

c.      The Victim indicated that if Hashimi knew she cooperated with
        law enforcement, she would not be inclined to cooperate further,
        suggesting that she could not take the risk because she now has a
        child.  She indicated that Hashimi had never done anything to her,
        but she thought he would.  The Victim asked whether the case
        could be dropped.

d.      The Victim indicated that Hashimi did not know her age because
        she lied to him.  She stated that since Hashimi told her that the
        police talked to him, she has had dreams about him killing her.

e.      The Victim indicated that Hashimi does not bother her anymore
        and she thinks he will leave her alone if it all ended.  She stated
        that he did not force her to do anything.

f.      The Victim stated that in an earlier statement to law enforcement,
        she stated that Hashimi had other girls working for him as
        prostitutes, but he did not.  The Victim indicated that she posted all
        her own prostitution advertisements and that Hashimi never posted

18

advertisements for her.

g.     The Victim stated that Hashimi hit her twice. She explained that
the first time he hit her because she threw something at him and
the second time he hit her because she lied to him. The Victim
stated that it was not because of "all of this."

## The Victim's Fifth Interview

26.     On April 14, 2016, Detective Stigerts interviewed the Victim again. The Victim
indicated that she was only meeting with law enforcement because her mother insisted that she
cooperate. The Victim confirmed that the information she provided on November 11, 2014, was
false. The Victim stated that the information she provided on July 8, 2015 was true, with an
exception: she was working as a prostitute on a daily basis when she was with Hashimi, not on
the more limited basis that she had previously described.

27.     During the April 14, 2016 interview, the Victim described an incident during
which she was contacted by law enforcement at a Motel 6 on Arden Way in Sacramento. The
Victim stated that she told officers that her name was Angel Rose, and that she also told officers
that she was not involved in human trafficking.

28.     Also during the April 14, 2016 interview, the Victim provided additional details
about her involvement in prostitution, including the cities and motels where she worked. The
Victim stated that Hashimi had driven her to Oakland and dropped her off in areas known for
prostitution activity. The Victim stated that she told Hashimi that she was 17 years old.
However, she also described an incident at a Metro PCS store during which Hashimi became
aware that she was younger than 17 years old. The Victim told Detective Stigerts that when she
was speaking to a clerk at the Metro PCS store, the Victim provided a false date of birth, which

19

would have made her then 16 years old. The Victim told Detective Stigerts that Hashimi heard the birthdate and confronted the Victim about her true age, because he recognized that the date of birth would have made her only 16 years old.

29.    In 2014, there was a Motel 6 located at 2030 Arden Way, in the county of Sacramento. I know from my law enforcement experience in the Sacramento region that the Motel 6 was known as a place with a high level of prostitution activity. Detective Stigerts conducted a search of the Sacramento County Sheriff's Department's records and located a report of deputies' contact with Hashimi on October 19, 2014. The contact occurred at 2030 Arden Way in room 283. This Sherriff's Department report is identified as CAD record 14-241388. The report indicates that when deputies contact Hashimi at the Motel 6, they found a female hiding under the bed. The female identified herself as Angel Rose. When deputies spoke to the female who identified herself as Angel Rose, she denied involvement with human trafficking.

## Indictment and Arrest of Hashimi

30.    On June 8, 2017, a grand jury in the Eastern District of California returned a one count indictment, charging Hashimi with violation of 18 U.S.C. § 1591(a)(1), sex trafficking of children, based on his conduct with respect to the Victim.

31.    On June 21, 2017, Elk Grove Police Department officers visited Hashimi's place of employment, which was located at 9124 Elkmont Way in Elk Grove, California. Officers found Hashimi at that address and arrested him pursuant to a federal arrest warrant.

32.    Elk Grove Police Officer Gergorio took Hashimi into custody. An officer searched Hashimi incident to arrest. During that search of Hashimi's body, an officer found a wallet, a gold iPhone Plus, and earphones. Elk Grove Police Officer Bagley transported Hashimi

20

to the United States Courthouse located at 501 I Street in Sacramento. There, I took custody of Hashimi and the above-referenced property that was seized incident to arrest. Hashimi was then transferred to the custody of the United States Marshals Service.

## Facebook Messenger Message From the Victim

33.     Prior to Hashimi's initial appearance before the Honorable Allison Claire on June 21, 2017, the property seized from Hashimi remained in my custody. While in custody of the iPhone, I observed notifications that appeared on the phone's screen. These notifications were visible without accessing or manipulating the phone. On the screen of the iPhone, I observed a text message received from a contact entitled "Baby Loo." I also observed a Facebook Messenger notification.

34.     The notification from Facebook Messenger was from contact Dxxxxxx Wxxxx, which I immediately recognized as the Victim's true name.[2] Without accessing or manipulating the phone, I was able to see that the content of the Facebook Messenger message from the Victim was the word "ya." Based on this affirmative response to Hashimi, there is probable cause to believe that there were prior communications between Hashimi and the Victim. On June 21, 2017, the Victim was 16 years old.

## Hashimi's and the Victim's Facebook Accounts

35.     I know that Facebook Messenger is a communication application that is directly associated with Facebook. I know that Facebook Messenger enables users to send private messages between Facebook accounts, in either one-on-one messages or in a group message

---

[2] The Victim's full name appeared on the screen of the iPhone. I have omitted the Victim's full name to protect her privacy.

format. This allows for communication that is not visible on a public Facebook page. Based on this information, I conducted a search of Facebook.com using the Victim's first and last name as it appeared on the message notification on Hashimi's iPhone. As a result of this search, I identified two accounts that had the same "display name" of the Victim's name and that featured photographs of the Victim. The user ID associated with these two of the Victim's accounts are: "royal.bowens"; and "nana.babycharles.9".

36. I conducted a search of Facebook.com using Hashimi's first and last name. As a result of this search, I located an account with the display name "ABDUL HASHIMI," and Facebook user ID "abdul.hashimi.73". A photo of Hashimi is displayed as the profile photo associated with the account.

37. On June 21, 2017, I sent a preservation request to Facebook.com using their online law enforcement portal. I requested that all three of the above-referenced accounts (royal.bowens; nana.babycharles.9; abdul.hashimi.73) be preserved for future legal process. I received a confirmation email from Facebook.com that each of the accounts has been preserved under Facebook case number 1154931.

38. I am familiar with Apple iPhones and am aware that a "pull down" screen on the phone can been accessed from the "lock screen," which allows the user to set the phone to airplane mode. This preserves the evidence and information contained within the phone and prevents any communication with outside sources that may affect the content of the phone. After observing the above-reference Facebook Messenger notification, I set Hashimi's iPhone to airplane mode, and turned off the iPhone prior to booking the iPhone into Sacramento Police Department Evidence.

22

Facebook.com

39.     Facebook owns and operates a free-access social networking website of the same

name that can be accessed at http://www.facebook.com. Facebook allows its users to establish

accounts with Facebook, and users can then use their accounts to share written news,

photographs, videos, and other information with other Facebook users, and sometimes with the

general public.

40.     Facebook asks users to provide basic contact and personal identifying information

to Facebook, either during the registration process or thereafter. This information may include

the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook

security questions and answers (for password retrieval), physical address (including city, state,

and zip code), telephone numbers, screen names, websites, and other personal identifiers.

Facebook also assigns a user identification number to each account.

41.     Facebook users may join one or more groups or networks to connect and interact

with other users who are members of the same group or network. Facebook assigns a group

identification number to each group. A Facebook user can also connect directly with individual

Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request"

accepts the request, then the two users will become "Friends" for purposes of Facebook and can

exchange communications or view information about each other. Each Facebook user's account

includes a list of that user's "Friends" and a "News Feed," which highlights information about

the user's "Friends," such as profile changes, upcoming events, and birthdays.

42.     Facebook users can select different levels of privacy for the communications and

information associated with their Facebook accounts. By adjusting these privacy settings, a

Facebook user can make information available only to himself or herself, to particular Facebook

users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

43.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

44.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

45.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on

Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

46.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

47.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

48.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

49.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

50.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

25

51.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

52.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

53.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

54.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

55.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member,

26

including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

56.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

57.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

58.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained

27

by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

59.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning

subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

60.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

61.     Based on the foregoing, I request that the Court issue the proposed search warrant.

62.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.


**[the remainder of this page is blank]**


29

## REQUEST FOR SEALING

63.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation aspects of which are neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Kristine R. Morse
Special Deputy United States Marshal
Sacramento FBI Child Exploitation Task Force

Approved as to form.

Brian A. Fogerty
Assistant United States Attorney

Subscribed and sworn to before me on _____6/29/17_____, 2017

The Honorable Allison Claire
United States Magistrate Judge

30

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user IDs "royal.bowens"; "nana.babycharles.9"; and "abdul.hashimi.73" which is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

I.    **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)    All contact and personal identifying information, including "royal.bowens", "nana.babycharles.9" and "abdul.hashimi.73": full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d)    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user, including all Facebook Messenger, private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)    The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

2

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1591(a)(1), sex trafficking of children, involving Abdul Basier Hashimi since August 2014, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Evidence of any communication between the Victim D.W. and Hashimi;

(b) Evidence of any communication by Hashimi regarding Victim D.W.;

(c) Items, information, records or images related to or used to further prostitution;

(d) Items, information, records or images which contain information pertaining to any individual's interest in the sex trafficking of a minor;

(e) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(f) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(g) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

3

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| Information Associated with Facebook user IDs "royal.bowens"; | ) Case No. 2: 17 - SW - . 5 6 9 — AC |
| "nana.babycharles.9"; and "abdul.hashimi.73" which is stored at | ) |
| premises controlled by Facebook, Inc. | ) |

SEALED

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the         Northern         District of         California
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before         July 12, 2017         *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐  Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐   for _____ days *(not to exceed 30)* ☐  until, the facts justifying, the later specific date of _____ .

Date and time issued:    6/29/17  3:15p                         _____
                                                                *Judge's signature*

City and state:      Sacramento, California                    Allison Claire, U.S. Magistrate Judge
                                                                *Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
Signature of Judge                                            Date

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user IDs "royal.bowens"; "nana.babycharles.9"; and "abdul.hashimi.73" which is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized**

I.      **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession,

custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs,

or information that have been deleted but are still available to Facebook, or have been preserved

pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the

following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including "royal.bowens",

"nana.babycharles.9" and "abdul.hashimi.73": full name, user identification

number, birth date, gender, contact e-mail addresses, Facebook passwords,

Facebook security questions and answers, physical address (including city, state,

and zip code), telephone numbers, screen names, websites, and other personal

identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts

and other Facebook activities;

(c)     All photos and videos uploaded by that user ID and all photos and videos

uploaded by any user that have that user tagged in them;

(d)     All profile information; News Feed information; status updates; links to videos,

photographs, articles, and other items; Notes; Wall postings; friend lists, including

the friends' Facebook user identification numbers; groups and networks of which

the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    All other records of communications and messages made or received by the user, including all Facebook Messenger, private messages, chat history, video calling history, and pending "Friend" requests;

(f)    All "check ins" and other location information;

(g)    All IP logs, including all records of the IP addresses that logged into the account;

(h)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)    All information about the Facebook pages that the account is or was a "fan" of;

(j)    All past and present lists of friends created by the account;

(k)    All records of Facebook searches performed by the account;

(l)    All information about the user's access and use of Facebook Marketplace;

(m)    The types of service utilized by the user;

(n)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)    All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

2

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1591(a)(1), sex trafficking of children, involving Abdul Basier Hashimi since August 2014, including, for each user ID identified on Attachment A, information pertaining to the following matters:

> (a) Evidence of any communication between the Victim D.W. and Hashimi;
>
> (b) Evidence of any communication by Hashimi regarding Victim D.W.;
>
> (c) Items, information, records or images related to or used to further prostitution;
>
> (d) Items, information, records or images which contain information pertaining to any individual's interest in the sex trafficking of a minor;
>
> (e) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;
>
> (f) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;
>
> (g) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

3